In the Matter of the Application of CITY OF SYRACUSE, Petitioner, for a Certiorari Order against JOHN T. GIBBS, Deputy Conservation Commissioner, and Others, Constituting the Water Power and Control Commission, Respondents.

VILLAGE OF JORDAN, VILLAGE OF SKANEATELES and TOWN OF SKANEATELES, Intervenors, Respondents.

Third Department, January 10, 1940.

*James C. Tormey, Corporation Counsel [George T. Driscoll, Assistant Corporation Counsel,* of counsel], for the petitioner.

*John J. Bennett, Jr., Attorney-General [Henry Epstein, Solicitor-General, Timothy F. Cohan* and *Jack Goodman, Assistant Attorneys-General,* of counsel], for the respondent Water Power and Control Commission.

*John C. McLaughlin,* for the Village of Jordan.

*E. C. Miller,* for the Village of Skaneateles.

*Milford & Major [Charles T. Major* of counsel], for the Town of Skaneateles.

HILL, P. J. Under the provisions of article 78 of the Civil Practice Act the city of Syracuse brings up for review an order dated August 20, 1936, made by the Water Power and Control Commission which directs the city to " permit the Village of Jordan to draw water from the city conduits in amounts not in excess of sixty-nine (69) million gallons in any one calendar year. * * * For all water actually so drawn the Village of Jordan shall pay to the City of Syracuse at the rate of two (2) cents per hundred cubic feet, measured by a meter, which meter shall be read and payments be billed and become due in accordance with the established procedure of the City of Syracuse." This is the last of three inter-related orders, made by the Commission, the first, September 22, 1931; the second, March 19, 1935.

Skaneateles lake is the source of the Syracuse water supply system. The waters are conveyed about twenty miles to the city in two conduits (with a third partially completed) from a single intake in the lake. The capacity is substantially forty million gallons per day. The water main of the village of Elbridge taps the city conduit about six miles from the lake, and the village takes water therefrom for municipal uses. The 1936 order contemplates that the village of Jordan will attach its mains to those which now serve the village of Elbridge.

The city has expended in excess of twelve million dollars in condemning and purchasing real property and in construction costs. It proceeded under numerous legislative grants, beginning in 1888 (Chap. 532). In 1889 (Chap. 291) the " Syracuse Water Board " was created, which was " authorized and directed for and in the name of the city of Syracuse to acquire, construct, maintain, control and operate a system of water works to furnish the city of Syracuse and its inhabitants with water from Skaneateles lake." In 1889 the lake was a source and feeder for the Erie canal. The statute of that year permitted Syracuse " by and with the consent of the Canal Board * * * to appropriate so much of the waters of Skaneateles lake as may be necessary to supply the city of Syracuse and its inhabitants with water;" the only reservation was that the

city furnish water for the use of the Erie canal. By numerous later statutes the rights of the city to take, use and sell waters from the lake were amplified, explained and re-enacted. The city urges that these grants entitle its local authorities to use and operate the system without interference, and that the Water Power and Control Commission has no jurisdiction. When the city desired, in 1931, to install an additional conduit, application was made to the Commission for approval of plans therefor. The Commission qualifiedly granted the application, its order reciting that the inhabitants of certain areas, including Jordan, " have a right so to be supplied superior to the rights of the city of Syracuse and applicant may draw from this lake only water which is in excess of the reasonable needs of these inhabitants," and it directed the city to permit the necessary connections to be made to its conduits and to furnish water to these areas " subject to such terms and conditions as may be specified by this Commission in its decision approving and authorizing such taking." Proceedings looking to the review of this order by certiorari were instituted by the city, but later abandoned. In 1935 the Commission directed that the village of Jordan be permitted to take water from the city conduits. The order recited: " The city of Syracuse, the village of Elbridge and the applicant [village of Jordan] have agreed as to the terms and conditions under which Jordan may obtain this water from Syracuse."

The authority and jurisdiction of the Commission is found in the Conservation Law (§ 523). The portion thereof which seems to apply reads: " The Commission shall determine whether the plans proposed are justified by public necessity, * * * and whether such plans are just and equitable to the other municipalities and civil divisions of the State affected thereby and to the inhabitants thereof, particular consideration being given to their present and future necessities for sources of water * * *. The Commission shall * * * either approve such application, maps and plans as presented or with such modifications in the application, maps and plans submitted as it may determine to be necessary * * * to bring into cooperation all municipal corporations, or other civil divisions of the State, which may be affected thereby; * * * or it may reject the application."

The impounding and distribution of potable waters are rights held in trust by the State for the benefit of all its inhabitants. A State may not by grant or contract divest itself of control of rights and properties held for the benefit of all the people, for in so doing it would divest itself of an incident of sovereignty and of powers vital to the public welfare. (*Matter of City of Rochester* v. *Holden,*

224 N. Y. 386; *Matter of City of Buffalo*, 68 id. 167; *Beer Co. v. Massachusetts*, 97 U. S. 25; *Cincinnati v. Louisville & Nashville R. R. Co.*, 223 id. 390; *Pennsylvania Hospital v. Philadelphia*, 245 id. 20; *Georgia v. Chattanooga*, 264 id. 472.) While the legislative grants to the city were unlimited and the city acting thereunder has expended millions of dollars, the city's title is subject to the sovereign power to control the just and equitable distribution of potable waters. I am unable to adopt the statements in the 1931 decision of the Commission that the inhabitants of certain towns have rights superior to those of the city of Syracuse in the waters of the lake. The entire public has an equal right to potable water. The Commission is to exercise just and fair supervision to the end that supplies which are more available for use by one community are not absorbed by another.

The Commission has exercised its jurisdiction over the distribution of the waters of the lake and has assumed control over twelve million dollars of property of the city and fixed rates at which the water flowing through the city conduits may be sold. The "Commission might, perhaps, have power to couple its consent with any direction which it would have independent power to make." (*People ex rel. Iroquois Gas Corp. v. Public Service Comm.*, 264 N. Y. 17, 19.) In *Matter of Quinby v. Public Service Comm.* (223 N. Y. 244, 263) the court was dealing with a statute which gave to the Public Service Commission the same power which the Legislature had to regulate rates of fare, but the opinion states: " It is impossible to find a word in the statutes which discloses the legislative intent to deal with the matter of rates fixed by agreement with local authorities. As it has often been held in connections other than that of legislative power over them that such agreements are valid, it may well be inferred that the Legislature excluded them from consideration by failure to mention them and that it has made no attempt to turn them over to the Public Service Commission for revision." " The power of the * * * Commission is extensive, and the act creating the Commission should be construed in the same spirit in which it was enacted. Still, when a particular power is exercised by the Commission or is claimed for it, that power should have its basis in the language of the statute or should be necessarily implied therefrom." (*People ex rel. N. Y. R. Co. v. Public Service Commission*, 223 N. Y. 373, 378.) *Matter of City of Niagara Falls v. P. S. Commission* (229 N. Y. 333) reaffirmed the doctrine of the *Quinby* case. " The Commission can exercise only such powers as have been specially conferred by statute, together with those incidental powers which may be requisite to effectually carry out those actually granted." (*People ex rel. Municipal Gas Co. v. P. S. Commission*, 224 N. Y. 156, 165.)

The Commission was empowered to determine whether the 1931 plans of the city were just and equitable to the village of Jordan and to bring into co-operation that village and any other municipal corporations affected. (§ 523, *supra.*) No basis permitting the fixing of a rate is found in the language of the section; neither is such a power necessarily implied. The Commission would have power to direct that the village place its intake alongside that of the city, and if, as asserted in one of the orders, the right of the village in that particular lake was superior to the city, it might be permitted to draw the lake to a lower level than the city, and possibly, as an alternative, the village might have been permitted by agreement to use the mains of the city, the value of that user to be fixed by a forum having jurisdiction.

The city's intake and the conduits, with the appurtenant real estate, is property devoted to a public use, which the Legislature has power to devote to another public use, and this power may be delegated to public officers or bodies, but such a delegation of power must be found in express terms in the statute or must necessarily arise by implication. (*Matter of Boston & Albany R. R. Co.*, 53 N. Y. 574; *Matter of City of Buffalo, supra; People ex rel. City of Buffalo* v. *N. Y. C. & H. R. R. R. Co.*, 156 id. 570; *People* v. *Adirondack R. Co.*, 160 id. 225.) There is no language granting to the Commission power to exercise acts of ownership and dominion over the conduits and intake owned by the city. That attempt, like the fixing of rates, was *ultra vires.* The fact that the Legislature, by express language, granted power to fix rates in connection with the New York city water supply and omitted to do so in the State at large is significant. The greater city is continually reaching out for sources more than a hundred miles from its borders. The use of these waters takes away from numerous small as well as large municipalities their natural source of supply. To prevent numerous court proceedings in the great and populous area drained by New York, the Legislature authorized the special rate-fixing procedure. It used language intended to effectuate that purpose in that one region, but omitted it in other parts of the State.

The issues discussed are raised by this review of the 1936 order. The earlier order of September, 1931, indicated an intent by the Commission to assume unauthorized powers, but nothing overt interfering with the rights of the city was directed, and the order of March, 1935, contained a recital that the city had agreed and consented to the use of its mains by the village of Jordan.

I believe with my associate that had the Commission the power to fix the rate to be charged, the amount fixed was so inadequate as to be arbitrary and capricious, but I do not agree that the

Commission had jurisdiction to fix a rate and to require the city to permit the village to use its facilities.

I favor an annulment of the order under review.

CRAPSER, SCHENCK and FOSTER, JJ., concur; HEFFERNAN, J., dissents in part in an opinion, and concurs for annulment on the sole ground that the matter should be remitted to the Water Power and Control Commission for the purpose of fixing a proper rate.

HEFFERNAN, J. (dissenting in part). This is a proceeding instituted by petitioner, City of Syracuse, to review by certiorari, pursuant to article 78 of the Civil Practice Act, the decision of respondent the Water Power and Control Commission, in Water Supply Application No. 1049, permitting the village of Jordan, in the town of Elbridge, Onondaga county, to draw a supply of water from the conduits of the city and fixing the price which the village should pay therefor.

Two questions are presented for decision: The jurisdiction of the Commission to make the determination and the reasonableness of the rate which it fixed. To determine whether the Commission had jurisdiction in the present application recourse must be had to the statutes dealing with the Syracuse water system and the Water Power and Control Commission.

By chapter 532 of the Laws of 1888 the Legislature authorized the city of Syracuse to determine a proper source of water supply for public, mechanical and domestic purposes. Skaneateles lake, located about eighteen miles from the city, was selected as the source of supply. In 1889, by chapter 291 of the Laws of that year, the Legislature authorized the creation of the " Syracuse Water Board " and conferred authority upon it to acquire, construct, control and operate a system of water works to furnish the city and its inhabitants with water from Skaneateles lake. The city was empowered to issue its bonds for the installation of the water system and to fix the water rates to be charged to consumers. It would serve no useful purpose to review all the subsequent legislation dealing with the Syracuse water system. Suffice it to say that by virtue of various legislative acts the city constructed a water supply plant, including conduits from Skaneateles lake, to supply its inhabitants water from that lake at a cost of approximately $12,000,000.

By chapter 723 of the Laws of 1905 the Legislature created the State Water Supply Commission, from which respondent derives its authority under the present provisions of article XI of the Conservation Law.

The act of 1905 provided, in substance, that no municipal corporation could take land for new or additional sources of water

supply until the proposed plans and maps had been submitted to and had been approved by the Commission. The matters to be considered by the Commission in passing upon an application were whether the plans were justified by public necessity and whether they were just and equitable to the other municipalities and civil divisions of the State affected thereby.

It is quite clear that after the enactment of this statute Syracuse was subject to the jurisdiction of the Commission.

By chapter 631 of the Laws of 1906 the Legislature again dealt with the Syracuse water supply. By this act the city was authorized to " acquire, construct, extend, maintain, control and operate a complete system of water-works to furnish said city and its inhabitants with water from Skaneateles lake."

Counsel for the city asserts that by the language quoted above the Legislature has given the municipality paramount regulation and control of its water supply. We think this contention is not well founded. There is no inconsistency between the grant of these powers to the city and a holding that their exercise is subject to the requirement that the Commission's consent should be obtained in order to acquire lands for a new or additional source of water supply. There is nothing in the 1906 statute which exempts Syracuse from the provisions of the 1905 statute which enunciated a State-wide rule. It seems to us that it is both logical and reasonable to conclude that after the enactment of the 1906 statute the city still had to apply to the Commission if it needed land for a new or additional source of water supply. Unquestionably, under the 1905 statute, the city could take additional water from Skaneateles lake without the consent of the Commission.

However, in 1911 (Laws of 1911, chap. 647) the Legislature enacted the Conservation Law, and the 1905 act at the same time became article 9 thereof, providing: " No municipal corporation * * * shall * * * have any power to acquire, or to take a water supply or an additional water supply, or to take or condemn lands for any new or additional sources of water supply * * * until the Commission shall have approved * * *."

Thus the limitations upon municipalities were considerably extended. The Commission's consent was necessary not only to take lands for new sources of supply but also to take a new or additional supply itself.

This construction of the 1911 act is not weakened by the fact that in 1906 the Legislature had authorized the city to take from Skaneateles lake as much water as was needed for its people. The legal effect of such a grant merely operated as a license to the city to take water from the lake and conduct it to the city subject to the

paramount right of the State to resume it at any time. Not only has the State the power but it its duty to control and conserve its water resources for the benefit of the public. (*Sweet* v. *City of Syracuse*, 129 N. Y. 316; *Matter of County of Suffolk* v. *Water Power & Control Commission*, 245 App. Div. 62; modfd. and affd., 269 N. Y. 158.)

Evidently the city acquiesced in this construction of the statutes, because in 1931 it applied to the Commission in Water Supply Application No. 609 for permission to take an additional supply of water from the lake and to make certain constructions. The Commission approved the application. In its decision, however, the Commission reserved the right to determine the amount of water that other sections of the State might take from Skaneateles lake; declared the right of several neighboring towns, including the village of Jordan, to be supplied from Skaneateles lake superior to the rights of Syracuse; and determined that any municipality in the towns named might apply to the Commission for permission to tap into the lines and conduits of the city.

The city obtained an order of certiorari to review this decision and, significantly enough, later consented to its dismissal. The city had the right, of course, to reject the Commission's decision by not accepting the benefits it bestowed. However, it did neither. It did not review and it did not reject. Instead it availed itself of the beneficial provisions of the decision. It is now too late to question the authority for, or the propriety of, the conditions imposed in Application No. 609.

Even if it be assumed that the city is not foreclosed to question that determination we are convinced that section 523 of the Conservation Law furnishes ample authority to justify the conditions which the Commission imposed. The pertinent provisions of that section are: " The Commission shall determine whether the plans * * * are just and equitable to the other municipalities and civil divisions of the State affected thereby and to the inhabitants thereof, particular consideration being given to their present and future necessities for sources of water supply * * *. The Commission shall within ninety days after the final hearing and with all convenient speed either approve such application, maps and plans as presented or with such modifications in the application, maps and plans submitted as it may determine to be necessary to protect * * * the water supply and interests of any other municipal corporation, or other civil division of the State, or the inhabitants thereof * * * or to bring into cooperation all municipal corporations, or other civil divisions of the State, which may be affected thereby * * *."

For some years, by contract with the city, the village of Elbridge has been obtaining water from the conduits of the city of Syracuse. That village taps into the city conduits about six miles from Skaneateles gatehouse.

Pursuant to the reservations and provisions of the Commission's decision in Application No. 609 the village of Jordan on January 29, 1935, applied to the Commission for permission to obtain a supply of water from the supply mains of the city of Syracuse through the mains of the village of Elbridge. That application was approved. That decision was not reviewed and the time in which to do so has now expired. Later the village sought the Commission's approval of the works which it constructed and for the issuance of a permit for operation. That application was likewise granted. The village and the city endeavored without success to agree upon the terms of a contract for water. The village then applied to the Commission to fix the quantity of water and the price to be paid. On August 20, 1936, the Commission made a decision requiring the city to permit the village to draw water from the city conduits in amounts not in excess of 69,000,000 gallons in any one calendar year, and directing the village to pay to the city for water drawn at the rate of two cents per hundred cubic feet.

For the reasons already stated we think the Commission has jurisdiction to make the determination. The quantity of water which the village is permitted to withdraw does not appear to us to be excessive in view of the proof on the subject.

We think the city is justly aggrieved, however, by that portion of the decision fixing the rate to be paid by the village. So far as the record discloses there is no proof whatever to warrant a finding that the rate fixed by the Commission is reasonable.

The formula which the Commission employed in determining the rate in the instant case is essentially the one which the Legislature formulated for the city of New York. There is no evidence in this record as to New York city water, or its rates or the methods adopted in the fixation of such rates.

The consumers of water in the city are charged at the rate of twelve cents per one hundred cubic feet. The city is authorized to sell surplus water not required for its needs to any water district in the county of Onondaga at reasonable rates. The rate paid by outsiders is eighteen cents per one hundred cubic feet. The villages of Elbridge and Nedrow are paying at the eighteen-cent rate under contracts voluntarily made. The Legislature has authorized the city to charge almshouses, schools and hospitals the same rate. The evidence shows that the estimated cost to the village of Jordan to provide its own system of conveying water from Skaneateles lake to the village would be approximately $237,000, and if the village

built and maintained its own intake and conduit line that the service cost of water on a basis of 100,000 gallons of water per day would amount to approximately twenty-seven cents per one hundred cubic feet.

By the Commission's decision the city is only permitted to receive a rate based on rental on the cost of a small portion of a very large circulatory system. The decision of the Commission fixing the rate is clearly arbitrary and unreasonable. It is without support in the evidence.

But, respondent argues, we may not overrule the determination on that ground and presses upon us *Matter of Niagara Falls Power Co.* v. *Water Power & Control Commission* (267 N. Y. 265) in support of its contention. No longer can there be any doubt as to our authority to examine the evidence in order to ascertain whether or not it supports the conclusion of the Commission. (*Matter of Ballston Town Highway,* 251 App. Div. 642; affd., 281 N. Y. 322.) Unquestionably we may pass upon the evidence. (Civ. Prac. Act, § 1296, subds. 6, 7.)

The decision should, therefore, be annulled on the law and facts, with fifty dollars costs and disbursements to petitioner, and the matter remitted to the Commission for the purpose of fixing a proper rate.

Decision annulled on the law and facts, with fifty dollars costs to the petitioner, and the matter remitted to the Water Power and Control Commission for action in accordance with the opinion.