WALTER S. LYON and Others, as Executors, etc., of ADDISON J. LYON, Deceased, Respondents, v. WATER COMMISSIONERS OF THE CITY OF BINGHAMTON and Others, Appellants.

Third Department, March 19, 1930.

*Edwin H. Moody, Corporation Counsel* [*Frederick Collin* of counsel], for the appellants.

*Mangan & Mangan* [*Frank J. Mangan* of counsel], for the respondents.

HINMAN, J. The rights of the plaintiffs as riparian owners along the Susquehanna river in the city of Binghamton and as owners of a dam across said river at that place, are based upon and run back to an agreement between landowners on both sides of the stream and legislation of March 10, 1828, when certain predecessors in title of the plaintiffs erected the dam in question at their own expense and pursuant to legislative authority. The plaintiffs are now the conceded owners of the lands situated upon the north bank of the said river upon which the northerly abutment of the dam in question rests, their land being about 400 feet fronting on the river by about 180 feet deep upon which stands the planing mill owned by them, and several other buildings. The plaintiffs are the owners of the water power generated in connection with this dam except that certain water power privileges have been granted by their predecessors to several other riparian owners who are entitled to use certain limited quantities of water for power purposes at their plants likewise located on the north side of said

river and in the vicinity of the plaintiffs' mill. The father of the plaintiffs obtained title to the property involved here in 1883. He died in 1894 devising said property by his will to the plaintiffs herein. The findings leave in doubt the ownership of the south side of the dam and the riparian rights connected therewith, but the plaintiffs have had at least color of title thereto since 1893, since which time all taxes thereon have been paid by the plaintiffs and the other north side mill owners, and there has been no mill at the south end of the dam since prior to 1874. The plaintiffs and these other north side mill owners and their respective predecessors have always maintained the whole dam at their own expense without any contribution from the city of Binghamton or otherwise.

In 1867 the water commissioners of the city of Binghamton acquired title to lands situated on the north side of a highway which ran along the north side of said river to the city of Binghamton, which highway had a frontage on the north bank of said river, about 4,000 feet above the dam. Shortly after acquiring said lands the water commissioners erected a pumping plant thereon on the north side of said street away from the bank of the river. They dug two large wells on said land about twenty-five feet square and twenty feet deep and drove at least four pipes six inches in diameter and about nineteen feet deep which constituted driven wells. Water flowed up out of said six-inch driven wells into the larger wells and was pumped out into water mains for the water supply of the city of Binghamton. Whatever water was taken through this system was not returned to the river above the dam since all of the sewerage of the city of Binghamton empties into the river below the dam. It does not appear that any of the water obtained as a water supply from said wells came from the Susquehanna river. There was, however, a growth in the population in the city of Binghamton from about 12,000 in 1870 to over 50,000 in 1915. Records of the amount of water pumped by the water commissioners were kept beginning in 1876 and continuing to the time of the trial in 1916. A table was prepared by stipulation from such records. It was found that prior to 1876 the flow from the wells was sufficient to supply the needs of the city. This was practically so up to about 1886 or 1887 when the water commissioners placed a crib in the middle of the river above the water plant and about a mile above plaintiffs' dam, and placed a thirty-inch pipe from said crib down to and into the large wells at the water plant through which water from the river ran into the wells by gravity. Prior to that time no water was taken from the river except in small quantities. It was stipulated that the amount of water drawn from the wells from 1886 down to and including

1902 was 2,500,000 gallons per day. The wells are still in existence but the amount of water being derived therefrom cannot be computed except by closing the gates of the city's intake pipes. In 1887 the daily average of water diverted by the city, after making an allowance of 2,500,000 gallons per day, from the wells was about 15,000 gallons. This increased until in 1902 such daily average had increased to over 2,500,000 gallons after making an allowance of 2,500,000 gallons per day from the wells. From 1903 to the date of the trial in 1916 this daily average increased until for six years immediately prior to the trial the city was diverting from the river approximately 4,000,000 gallons daily.

About February, 1899, another crib was placed in the river by the water commissioners about a half mile above the first crib and a thirty-six-inch pipe was laid from it running into the large wells of the water plant and the water ran through this pipe by gravity. In 1902 the defendants constructed a filtration plant of 10,000,000 gallons per day capacity which was doubled in capacity in 1914. In 1912 a storage reservoir was constructed by the city, water being pumped into it from the defendants' plant above the dam. In 1916 another storage reservoir was constructed to which water was pumped from the defendants' plant. At the date of the trial defendants had in place four pumps with a total capacity of 46,000,000 gallons a day. For a number of years the city has sold water to the village of Port Dickinson, which adjoins the city, and to some other consumers.

The first intimation that the plaintiffs had that the water commissioners of the city of Binghamton were taking water in any great quantities was in 1894. In 1895 the plaintiffs and the other owners of water power rights at this dam served upon the water commissioners of said city a notice that the city had no right to divert the waters from their natural channel and forbidding any further diversion. The suggestion was made that the commissioners devise some other means for supplying the city with pure and wholesome water. The city, however, has continued to divert the waters in increasing quantities and has enlarged its plant for so doing without the consent of the plaintiffs or their predecessors and without any right to do so whatsoever. The plaintiffs are riparian owners below the point of diversion of waters of the stream by the defendant city of Binghamton. As such riparian owners plaintiffs possess the right to have and enjoy the full flow of the stream save such as may be lawfully taken for domestic purposes. (*Whalen* v. *Union Bag & Paper Co.*, 208 N. Y. 1, 5.) This defendant is wrongfully diverting and using the water of the stream beyond the reasonable use of it

"for such domestic purposes as are inseparable from and necessary for the free use of [the] land." (Id.) By such use this defendant has not acquired any right or title to such excessive use. To so acquire title the "adverse possession must be exclusive, under no permission or license or favor upon the part of the owner; the claim must be under color of independent title exclusive of any right derived from the actual owner." (*Hinkley* v. *State of New York*, 234 N. Y. 309, 316.)

The city disregarded the rights of the plaintiffs not only after notice but after the commencement of this action in 1910, since which time the city has constructed additional storage reservoirs and additional pumps. The city has acquired no prescriptive rights. It has developed most of its plant with full knowledge of plaintiffs' claims and in defiance and disregard thereof and has been greatly benefited thereby. There is no basis for its claim of estoppel or laches.

The important question is whether the plaintiffs are entitled to the equitable relief granted below, permanently enjoining the city from continuing to divert the water from the river for its water supply purposes. The finding is that there is no evidence to show that the plaintiffs suffered any actual pecuniary damage by diversion of water for the six years prior to the commencement of the action and up to the time of the trial. The 4,000,000 gallons per day, the approximate daily average amount diverted by the city for the six years immediately prior to the trial, are equivalent to a flowage of less than six and one-half cubic feet per second. The average yearly flow of the river at said dam for fourteen years prior to the year of the trial was about 4,400 cubic feet per second. The average yearly low water flow of said river during said period, obtained by averaging the lowest monthly flowage of each year, was about 670 cubic feet per second. The plaintiffs' mill was not equipped to use the flowage of a quantity exceeding 278 cubic feet per second. The prior rights of the other north side mill owners amounted to the use of a quantity not exceeding 233 cubic feet per second. Their adverse rights in the driest periods were only 194 cubic feet per second. The power from the dam has been sufficient at all times under normal conditions to run all the wheels installed by the plaintiffs and the other north side power owners. Plaintiffs' mill ran on the water power from the dam every day from prior to 1873 to March 29, 1916, except Sundays, nights and holidays and except days of extreme floods or ice jams. The plaintiffs had an auxiliary steam plant but the only time this engine had ever been used was for a period of twenty days about twenty years prior to the trial when an ice jam below the dam

backed the water up to the level of the crest of the dam. For several years prior to 1913 the dam leaked badly. After it was repaired in 1913, until March 29, 1916, when the ice breaker at the north end of the dam was carried away by ice, water flowed over the crest of the dam every day including times of low water. There was water enough for plaintiffs to install and use larger water wheels with more power. The developed and undeveloped horse power of the river in a normal year is 1,462 horse power, of which plaintiffs have developed only 146 horse power.

There is a great superabundance of flowage over the crest of the dam, unused and going to waste, notwithstanding the diversion of water by the city. The plaintiffs have sustained no damage in the past and no such damage is threatened. The trespass upon their legal rights by the city is not shown to have prevented or interfered with plaintiffs' present or contemplated use of their lands and water power rights.

On the other hand, the city authorities are satisfying a most important need of the inhabitants of the city and large sums of money have been expended for that purpose without causing any present or threatened injury to the plaintiffs. The river is the only available source of water supply for the city. The injunctive remedy is an extraordinary one and must be exercised with great caution. " An equity court is not bound to decree an injunction where it will produce great public or private mischief, merely for the purpose of protecting a technical or unsubstantial right." (*McCann* v. *Chasm Power Co.*, 211 N. Y. 301, 306.) To restrain the present use of the water by this defendant is inequitable under the facts as presented. It has many times been held that under such or analogous facts a court of equity will refuse to issue an injunction. (*McCann* v. *Chasm Power Co.*, *supra; O'Reilly* v. *New York Elev. R. R. Co.*, 148 N. Y. 347; *Doyle* v. *Metropolitan E. R. Co.*, 136 id. 505, 511; *Forstmann* v. *Joray Holding Co., Inc.*, 244 id. 22; *Thompson* v. *Fort Miller Pulp & Paper Co.*, 195 App. Div. 271; *Powlowski* v. *Mohawk Golf Club*, 204 id. 200; *Sumner* v. *City of Gloversville*, 35 Misc. 523; *Crownen* v. *Wellsville Water Co.*, 3 N. Y. Supp. 177; *Ulbricht* v. *Eufaula Water Co.*, 86 Ala. 587; *Wintermute* v. *Tacoma Light & Water Co.*, 3 Wash. 727; *Fifield* v. *Spring Valley Water Works*, 130 Cal. 552.) The injunctive relief granted by the judgment below should be suspended until such time as substantial damage shall be suffered by the plaintiffs or shall be impending. (*McCann* v. *Chasm Power Co.*, 151 App. Div. 304; affd., 211 N. Y. 301.) The judgment for nominal damages preserves the title of the plaintiffs and prevents the defendant

from obtaining any prescriptive right to divert the waters, and that part of the judgment should be affirmed.

That part of the judgment granting an injunction should be modified by suspending its present operation and providing that the plaintiffs may at any time apply at the foot of the judgment, upon showing substantial injury from any cause to them hereafter occurring, for a judgment substantially as provided in the present judgment, or as the court may direct, or at their election the plaintiffs may bring such separate action for such or other relief as they may be advised on account of any injury to their property hereafter occurring, and as so modified the judgment appealed from should be affirmed, without costs to either party.

VAN KIRK, P. J., DAVIS, HILL and HASBROUCK, JJ., concur.

Judgment modified in accordance with opinion, and as so modified affirmed, without costs.