MILTON D. BLOSS et al., Plaintiffs, *v.* VILLAGE OF CANASTOTA et al., Defendants.

Supreme Court, Trial and Special Term, Madison County, September 12, 1962.

*R. J. & P. R. Shanahan* (*Paul R. Shanahan* of counsel), for plaintiffs. *Michael Powers* for the Village of Canastota, defendant. *John F. Robertson* for Town of Lenox, defendant.

HOWARD A. ZELLER, J. Plaintiffs, Bloss and Jones, own and occupy dairy farm lands in the Town of Lenox, Madison County. Defendant Village of Canastota is incorporated, had a 1960 census population of 4,896 and is located within the boundaries of the town.

Bloss and Jones, seek a judgment prohibiting the village and town from operating a municipal dump and for money damages. They complain that the usual method of dump operation has resulted in massive rat infestation of their farm causing disease in their dairy herd, a high bacteria count in the milk produced on their farm and actual damage to farm buildings and harvested crops. They further allege that ash, dust, and smoke have contaminated both graze and standing crops, periodically prevented work in the fields and rendered the farm premises generally less desirable for occupancy and use.

Defendant Town of Lenox contracts with the village for use of the dump for persons residing outside of the village but within the town. From the evidence produced at the trial it is clear that the town neither has the right to, nor does, exercise any control over the management or operation of the dump. Bloss and Jones are not entitled to any relief against the town and their complaint as to it should be dismissed upon the merits.

Defendant Village of Canastota moved during trial for a dismissal upon the grounds that this action is barred by the failure of Bloss and Jones to file a notice of claim and begin this action within the time limitations fixed by legislation. Section 341-b of the Village Law reads, "no * * * action shall be maintained against the village unless the same shall be commenced within one year after the cause of action therefor shall have accrued, nor unless a notice of claim shall have been made and served in compliance with section fifty-e of the general municipal law." Subdivision 1 of section 50-e of the General Municipal Law provides that notice of claim shall be given within 90 days after the claim arises in any case founded upon tort where notice of claim is required.

Section 50-i of the General Municipal Law states that "No action or special proceeding shall be prosecuted or maintained against a * * * village for * * * damage to real or personal property alleged to have been sustained by reason of the negligence or wrongful act of such * * * village

\* \* \* unless, (a) a notice of claim shall have been made and served in compliance with section fifty-e \* \* \* and (c) the action or special proceeding shall be commenced within one year and ninety days after the happening of the event upon which the claim is based.''

The contentions of the village are that the opening and operation of the dump in its present manner is '' the event '' basic to Bloss and Jones' case; that such '' event '' occurred many years prior to institution of their suit and, that any cause of action therefor likewise accrued many years before service of their notice of claim on August 3, 1960.

However applicable the village's argument may be to isolated or single acts for which a municipality might become liable, the defensive theory does not apply to the continuing series of allegedly tortious acts of both omission and commission constituting the claim in this lawsuit. It is axiomatic that where continuing trespass or nuisance exists, each new day establishes the cause anew. (*Meruk* v. *City of New York,* 223 N. Y. 271; *Sammons* v. *City of Gloversville,* 175 N. Y. 346; see *Village of Victor* v. *Angelo,* 14 Misc 2d 577, motion to dismiss appeal denied 10 A D 2d 602, 13 A D 2d 889; *Meinken* v. *County of Nassau,* 14 Misc 2d 304.) Thus, neither the Village Law nor the General Municipal Law bars a claim based upon acts of continuing trespass or nuisance allegedly in existence on the very day Bloss and Jones filed their notices of claim.

And where equitable relief is sought in the form of enjoining a continuing trespass or nuisance, the case is *not* one '' where a notice of claim is required by law ''. In fact, injunctive relief may be granted in the proper case where the acts or the injury are only threatened or prospective and are unrelated to any '' event '' or '' cause of action \* \* \* accrued ''. Therefore, the provisions of section 50-e of the General Municipal Law do not constitute a bar here. (See *Village of Victor* v. *Angelo,* 13 A D 2d 889, *supra; Grant* v. *Town of Kirkland,* 10 A D 2d 474; *Weigl* v. *Carey,* 256 App. Div. 986.)

Whatever limiting effects upon recovery of money damages the foregoing statutes may have is here of no concern because upon the trial Bloss and Jones limited their claim of damages to the period beginning 90 days preceding service of their notices of claim. (General Municipal Law, §§ 50-e, 50-i; see *Grant* v. *Town of Kirkland, supra.*)

Thus, the village is not entitled to have the complaint dismissed for legal technicalities but the village and Bloss and Jones should have a decision upon the merits of the lawsuit as disclosed upon the trial.

The dump has been in operation since 1947 and consists of approximately 14 acres of low land on the west edge of the village between the main line of the New York Central Railroad to the south and the old Erie Canal to the north. Two or three acres of the dump area customarily are in active use where some attempt is made to burn garbage and refuse in the open.

The Bloss and Jones farm lands comprise approximately 525 acres which lie to the north of the old Erie Canal. Of this total acreage the complaint confines itself to only those 231 acres which were acquired by them prior to the opening of the dump in 1947. The main farm buildings and dwelling, referred to as the " Home Farm ", are approximately 1,100 yards north of the dump. The tenant house and buildings, called the Strobel Farm, lie just over 200 yards north of the dump.

The village engages a dump custodian who is supposed to be present there from 8 :00 A.M. to 6 :00 P.M. on Tuesday, Wednesday, Thursday and Saturday of each week for which he is paid $35 per month and is given salvage rights. As his earnings from the village are less than 11¢ an hour, it is likely that most of the custodian's time is devoted to salvage rather than to the care and supervision of the dump. It is significant that the village did not call this custodian to testify at the trial.

A modern tank type truck collects garbage and refuse in the village several times a week from its homes, restaurants and business places. No municipal collection service is provided in the town. Some residents of the village and town bring their own refuse to the dump and deposit it in areas not currently designated for dumping. Refuse is also dumped frequently near the gates and along either side of the fencing enclosing the dump when its gates are locked. The result is accumulations of refuse which are neither burned nor covered in the usual processes of the dump's operation. Although its ordinances seem to prohibit such practices, the village has never prosecuted such violations.

Large quantities of spoiled onions, raw animal entrails and industrial waste are dumped but not properly treated or covered for long periods of time. The last clean earth was hauled into the dump in August 1961, some 11 months prior to the trial. A sanitary engineer called as a witness by the village testified that such infrequent coverage of garbage and refuse by clean fill is inadequate.

On one occasion firings of the dump reached such proportions that burning embers fell in the immediate vicinity of the buildings on the " Home Farm " (1,100 yards away) and embers and ash fall are more frequently evident at the Strobel Farm (200

yards from the dump area). Partially due to embers, stench and the number of rats present, the Strobel house has not been fit for occupancy since 1956. Stench and smoke are sometimes noticeable a mile from the dump. It is a fair conclusion that fires larger than necessary occur because refuse accumulations become excessive in the active dump area either because of too infrequent or relatively ineffective firing of debris, or re-ignition of partially burned over but uncovered refuse.

Rodent control is undertaken only once every three months by spreading poison bait which must be eaten with 24 hours to be effective. The common (Norway) rat has an average life span of 2 to 3 years, is able to reproduce at the age of 4 months, and gives birth to litters up to 18 in number following a 21-day gestation period. The present rodent control program followed by the village is inadequate. Bloss and Jones have found it necessary since 1959 to employ the same concern to spread poison bait at least monthly on their farm in order to keep fair control of the situation. While the dump is not the sole reason for rats on the farms in the neighborhood it is the source of a greatly multiplied rat population.

In 1960 and 1961 a veterinarian found part of the Bloss and Jones herd infected by leptospirosis, a bovine disease passed to cattle through nose and mouth. Rats, although not the sole carrier, do spread the disease. Leptospirosis reduces milk production among its other effects. The dump fall-out onto the fields and the pervasive presence of rats contribute to the increase in bacteria count in Bloss and Jones' dairy operation and the ringworm infection discovered in the young stock. Since 1959 quantities of grain have been spoiled by rats, and in 1961, 200 tons of hay were discovered to be unfit for use because of rat spoilage.

The village has the legal right to acquire " lands for the establishment of a public dump "; to provide for " the removal from the buildings in said village and for the disposition of swill, garbage, ashes and rubbish of said buildings "; and " to cause to be consumed by fire or heat * * * any animal or vegetable refuse, dead animal, carrion, offal, swill or garbage ". (Village Law, § 89, subds. 23, 25; § 344.) It is inconceivable that a public dump can be operated without distress and discomfort to some individuals, but those individuals certainly are entitled to redress if a dump is operated so carelessly that it becomes a nuisance.

Whether a particular method of use and operation constitutes a nuisance or not depends upon whether it is reasonable under all the surrounding circumstances. To warrant judicial inter-

vention, the distress, inconvenience and discomfort must not be fanciful, slight or theoretical but certain and substantial. (*Bove* v. *Donner-Hanna Coke Corp.,* 236 App. Div. 37, motion for leave to appeal denied 236 App. Div. 775.)

In this case the manner of operating the dump is careless and not in keeping with standard methods; the disturbance and damage to Bloss and Jones are real and substantial. The dump has caused them discomfort, inconvenience, distress, and financial loss. It has produced unhealthful conditions affecting their farm lands and dairy operation. Consequently, the present mode of use and operation does constitute a nuisance.

The village officials have an awareness of the problems involved in disposing of garbage and refuse. A modern type truck is used in collection, some custodial supervision has been supplied, and the need for clean fill has been considered. But this fact remains — the dump does constitute a nuisance. '' Where the public dump is shown to be a nuisance, the court may grant relief by enjoining its operation, either unconditionally, or pending certain preventive and curative measures ''. (52 A. L. R. 2d 1136.)

The continued use and operation of the village dump should be prohibited and enjoined unless within 60 days the village (1) engages a custodian whose sole duty is to personally supervise the dump at all hours when it is open to the public; (2) prohibits by a definite and enforcible ordinance dumping near the gates and fences and in any areas of the dump except those designated; (3) detects and prosecutes violators; (4) causes fires to burn under controlled conditions; (5) adopts a program of effective rodent extermination and control; (6) causes all garbage and refuse to be bulldozed into the swamp area and covered with clean fill to an adequate depth within one week of deposit except during cold months; and (7) prohibits or properly regulates the dumping of industrial waste, large quantities of vegetables, and animal carcasses and entrails.

These conditions are general in some respects and will be made definite in the judgment to be entered on this decision.

The other type of relief requested by Bloss and Jones is money damages. The largest item concerns the 200 tons of hay valued at $20 per ton and rendered worthless by rats. According to a son of one of the owners who worked on the farm for 13 years, some of this hay was stored in the barn from 1958 until it was found unfit for feed purposes in 1961. He also testified that during 1959 and 1960 additional bales were added to this loft of hay and that some of the original hay was consumed by the dairy cattle. As noted heretofore, Bloss and Jones are limiting their

claims of money damages to a period commencing on May 3, 1960 which is 90 days preceding the filing of their notice of claim. There is no possible way from the evidence to ascertain within reasonable limits what proportions of this hay were damaged prior to, during, and subsequent to the effective period of their claim. Therefore, there is no equitable way of fixing money damages.

Bloss and Jones also claim $15 per month which they have paid for rat control. There is no proof that some rat control would not have been necessary even if the dump did not exist. Again, there is no proper method of apportioning the amount paid to control the rats whose origins were from the dump.

A cow of the value of $300 was lost from disease in 1961. But no evidence establishes the onset of this ailment within the period of the claim or directly links it with either the dump operation or infection borne by a dump rat. Bloss and Jones also had damage to their buildings because of the rat infestation but presented no evidence concerning either the monetary extent of the damage produced by dump rats or that such damage accrued within the effective period of their claim. Other losses suffered by Bloss and Jones accrued prior to the effective date of their claim or have not been proven in such a manner as to permit calculation of monetary damages.

The problems of proof of damages are difficult but should not be solved by arbitrarily establishing a damage figure which is not reasonably supported by factual evidence. The request of Bloss and Jones for an award of money damages should be denied.