**HACKENSACK WATER COMPANY,**
**Plaintiff,**

v.

**The VILLAGE OF NYACK, Defendant.**

**No. 67 Civ. 2573.**

United States District Court
S. D. New York.

Aug. 16, 1968.

LeBoeuf, Lamb, Leiby & MacRae, New York City, for plaintiff; by Taylor R. Briggs, and Ann Dudley Cronkhite, New York City, of counsel.

Costello, Cooney & Fearon, Syracuse, N. Y., for defendant; Gerald R. Kane, Nyack, N. Y., by George R. Fearon and Angela E. Struglia, Syracuse, of counsel.

## OPINION

POLLACK, District Judge.

This is a diversity case. Motions by both parties are before the Court for summary judgment under Rule 56 F.R. Civ.P.

Plaintiff Hackensack Water Company, ("Hackensack" hereafter), is a water service company which draws water from the Hackensack River to service the public in the counties of Bergen and Hudson in Northern New Jersey. Hackensack owns riparian lands in New Jersey along and adjoining the River which are located 5 miles downstream (south) of the point where the Nyack Water Works, i.e., the defendant, obtains water from the River for the use of the cluster of communities known respectively as South, Central, West and Upper Nyack and the Village of Nyack itself. Nyack returns virtually none of the diverted water to the River, but releases any excess into the Hudson River or within the Hudson watershed thus depriving Hackensack River downstream owners or users of the quantity taken by the defendant.

Plaintiff asserts that the flow of the River is decreased by defendant's average diversion of more than 1.384 million gallons per day rendering the flow inadequate to meet plaintiff's water supply requirements and that plaintiff has had to purchase water from other suppliers to meet its needs. Consequently, the plaintiff seeks a summary judgment under Section 429–j(5) of the New York Conservation Law, McKinney's Consol. Laws, c. 65, declaring the rights of the plaintiff Hackensack to be compensated by the defendant Nyack for its withdrawal and diversion without return of the water of the River and limiting further proceedings in this case to an assessment of the amount of damages.

The answer to the complaint admits that Nyack is drawing water from the River and that it is supplying customers in its area, but denies that it is interfering with or violating any rights of the plaintiff. The answer also raises as affirmative defenses that (i) the complaint is insufficient in law, (ii) that plaintiff, having failed to comply with notice of claim statutes, is barred from prosecuting the law suit, (iii) that plaintiff has been guilty of inexcusable laches, (iv) that New York State which owns and controls waters of the River in the State has given Nyack permission to use the waters, (v) that the New York Water Power and Control Commission (now Water Resources Commission) and the Appellate Division of the Supreme Court of New York rendered certain decisions which are a bar to the plaintiff's claims.

Defendant contends that if the following are not found in its favor as a matter of law, there are genuine issues to be tried herein concerning: whether in fact there has been any diversion of water; whether the authorization to Nyack to construct a new water filtration plant also held that lower riparian owners were to be compensated by the courts for damages; whether Nyack plans to divert water at double the present rate from the Hackensack River to the Hudson River watershed; whether the flow of the River has been inadequate to meet plaintiff's legitimate requirements; and whether plaintiff did in fact meet

the requirements for filing of claims against Nyack in accordance with the relevant sections of the Village Law of New York State. The defendant also challenges plaintiff's factual contention that plaintiff has annually incurred substantial expenditures for the regulation of the flow of the River, improvements of conditions during dry weather and conservation of the waters of the River.

The defendant has counterclaimed for damages asserting that plaintiff and its wholly owned subsidiary, Spring Valley Water Company, have attempted unfairly to interfere with and appropriate Nyack's water customers and have inspired a groundless taxpayer's action against Nyack and done other acts with the intent or result of unfair competition or violation of the federal and state antitrust laws.

The plaintiff's opposing statement denies the substantive facts of the counterclaim.

Affidavits and exhibits submitted by the parties in support of their respective motions and in opposition to the motions of the other party reveal the following background facts:

The Hackensack River rises in the northern part of the town of Clarkstown in Rockland County, New York, flowing southward, west of and parallel to the Hudson River. The River flows past property owned by the defendant village near the New York-New Jersey border, then past the riparian land of the plaintiff through New Jersey and into Newark Bay and the Atlantic Ocean.

Both parties are dependent upon the Hackensack River as a source of water supply. The plaintiff renders water service to the public in Bergen and Hudson counties in New Jersey, furnishing water for domestic, commercial, industrial and fire protection purposes in 59 municipalities having a combined population in excess of 800,000 persons. Plaintiff is the owner in fee of approximately 90% of the riparian lands lying along and adjoining both banks of the Hackensack River in New Jersey, and

has for many years developed and improved the River as a source of water. Plaintiff has constructed two reservoirs in the mainstream of the River in New Jersey, one located at Oradell, the other in Rivervale and Old Tappan (Lake Tappan).

The defendant has constructed a water intake system approximately five miles upstream of plaintiff's riparian land. The water thereby diverted serves approximately 12,500 persons and commercial enterprises in the Village of Nyack as well as inhabitants of South Nyack, Central Nyack, and portions of West Nyack, and Upper Nyack. Water diverted and not consumed by the defendant is expelled into the Hudson watershed and so is lost to the plaintiff.

Nyack originally acquired its water supply system in 1896 by condemning the property of a private water company. Water has been taken from the Hackensack River for use in the system since the nineteenth century. Until 1951, the plaintiff was the only other public water supply system using the River. In that year, however, the Spring Valley Water Company, a wholly owned subsidiary of the plaintiff, then supplying water from wells to residents of Rockland County in New York, applied to the New York Water Resources Commission for permission to draw water from the Hackensack River, and to build a dam and reservoir on the River above the defendant's intake (Application No. 2189, decided July 23, 1952; such application was required by §§ 450–451 of the New York Conservation Law). Creation of the dam and reservoir was expected to increase the dependable yield of the River in Rockland County below the dam to 20 million gallons per day (abbreviated hereafter as "MGD"). The papers submitted to the Court do not reveal the yield prior to 1951.

In approving the project, to be known as the DeForest Dam and Reservoir, the Commission cited the water needs of residents of Rockland County and of New Jersey, and placed certain restric-

tions on the daily yield of the watershed. Ten MGD were forever reserved for the needs of inhabitants of Rockland County (Finding No. 60). Spring Valley must release from the reservoir "at least" two MGD reserved for Nyack, subject to adjustment should Nyack's needs prove greater than anticipated (Finding No. 57 and Condition K); and 7.75 MGD must be released from the reservoir for passage into New Jersey (Finding No. 56).

Residents of the area to be flooded opposed the proposed dam and reservoir. New Jersey appeared before the Commission to insure that a sufficient amount of water would be permitted to flow into the State of New Jersey. The objectors contended that no direct benefit would accrue to residents of Rockland County, but rather to Bergen County in New Jersey. The Commission, however, stated that it had "full power to see that this project is operated solely for the benefit of citizens of Rockland County. The only benefit to the Hackensack Water Company [in New Jersey] and the people of New Jersey is the incidental benefit of a regulated flow in the river" (Finding No. 37). The Commission stated that it had given due regard to the interests of the State of New Jersey in maintaining a regulated flow, in pursuance of a policy of " 'equitable apportionment' " (Finding No. 51).

The determination of the Commission was affirmed on appeal, Rockland County Anti-Reservoir Ass'n v. Duryea, 282 App.Div. 457, 123 N.Y.S.2d 445 (3rd Dept. 1953). The plaintiff herein agreed to the conditions of the Commission and argued in favor of its affirmance in the Appellate Division.

Spring Valley completed and began operation of its reservoir in 1956 but actual use of the reservoir, dam and filtration plant to supply its customers did not occur until 1963. Meanwhile, between 1952 and 1958, Nyack continued to distribute water from the River to its users. Nyack's requirements had grown from 1.102 MGD pumped in 1952 to 1.4 MGD in 1957. At this rate of increase,

a new filtration plant of increased capacity would be needed to meet Nyack's present and future needs for water.

In 1958, Nyack applied to the Water Resources Commission for approval of a new filtration plant of increased capacity (Application No. 3431, decided December 9, 1958). The defendant's application was for permission to take up to an average of 3 MGD, and up to 4.8 MGD during peak periods, from the River.

The plaintiff and Spring Valley objected to the 1958 application, contending that the entire flow of the stream except for a small amount which had been acquired by prescription or had been used for the past fifteen years by defendant, should be reserved to them. In support of this objection the plaintiff contended that because one purpose for the construction of the DeForest Dam and Reservoir had been to maintain a regulated flow into its Oradell Reservoir in New Jersey, it had advanced large sums of money to Spring Valley for the completion of that project.

The Commission, over this objection, granted Nyack permission to take an average of 3 MGD from the River, with a peak diversion not to exceed 3.75 MGD (Condition A). In its findings of fact, the Commission pointed out that its 1952 decision reserved 10 MGD, not for Spring Valley, but for the residents of Rockland County and that the construction of the DeForest Reservoir had increased the plaintiff's yield from the Hackensack River from 45 MGD to between 52.5 and 61.5 MGD.

Nevertheless, Hackensack claimed, it and its subsidiary holding companies owning riparian land along the River would sustain damages from the defendant's diversion. It was contended that if no provision were made for the payment of damages and for the power of the defendant to borrow money for that purpose, such additional diversion would violate the constitution and laws of the State of New York, in that it would authorize a taking of plaintiff's property

without compensation. The Commission, in response to this claim, stated:

"It is not within the purview of this Commission to determine the amount of compensable damages which might be caused by the diversion of water from the Hackensack River. Payment for such legal damages presumably could be made by the village from sources of funds available to it * * *. The compensable amounts can be determined, if necessary, by the courts * * *." (Finding No. 44).

The determination of the Commission was upheld on review. Spring Valley Water Works and Supply Company v. Wilm, 14 A.D.2d 658, 218 N.Y.S.2d 800 (3d Dept. 1961).

The new filtration plant authorized by the 1958 decision has not yet been built because of certain undecided litigation. The defendant's diversion of water from the River averaged 1.374 MGD in 1966 and 1.384 MGD in 1967. It presently withdraws more than 1.4 MGD as a daily average. Recently, the defendant has announced plans for the construction of a new filtration plant and new pumping facilities which will operate to double this flow having a rated capacity of 3 MGD.

In 1965, the plaintiff applied to the New York Water Resources Commission for and was granted permission to build a reservoir, now known as Lake Tappan. (Application No. 4925, decided July 22, 1965). It was estimated that this reservoir would add another 10 MGD to the safe yield of the River available to Hackensack, raising the plaintiff's yield from the River to 77 MGD. The New York Commission, in approving the plan, specifically reserved to the defendant the amounts granted in 1958 as well as the right to apply for increases in the future. New Jersey's Commission also approved the project. (Application to New Jersey Department of Conservation and Economic Development, Division of Water Policy and Supply, No. 1239, Approved May 20, 1965, Amended June 17, 1965, Amended July 6, 1965).

The New Jersey Commission limited the diversion from the Oradell Reservoir —Woodcliff Lake—New Jersey Reservoir No. 3 system to a maximum annual average of 92 million gallons daily exclusive

"of any water which may be obtained from sources in New York State in excess of the actual use of water in New York State pursuant to the requirements of the New York State Water Resources Commission and of the releases from storage in DeForest Lake allocable to the maintenance of the required releases for the benefit of the State of New Jersey." (¶ 2, p. 2).

The dam has since been constructed and was dedicated on June 10, 1967.

Plaintiff is unable to meet its water supply requirements through the use of the Hackensack River alone, and has, during the period 1964–1966, expended a total of $759,512 in purchasing 5,710,468,000 gallons from other sources.

The questions presented on these motions for summary judgment are whether there is a genuine issue as to any material fact, and if not, which party is entitled to judgment as a matter of law.

The respective rights of upstream and downstream riparian owners are simply stated. An upstream riparian owner may not unreasonably divert or appropriate the waters of a flowing stream. This has been the common law of both New York and New Jersey for more than a century. Society for Establishing Useful Manufactures v. Morris Canal and Banking Co., 1 N.J.Eq. 157 (Ct.Ch.1830); Gardner v. Trustees of Village of Newburgh, 2 Johns. Ch. 161 (N.Y.Ct.Ch.1816). The courts of both states have consistently and repeatedly required riparian land owners to restore all flowing waters to the stream, subject only to a reasonable allowance for domestic use and consumption. Higgins v. Flemington Water Co., 36 N.J.Eq. 538 (Ct.Err. & App.1883); City of Paterson v. East Jersey Water Co., 74 N.J.Eq. 49, 70 A. 472 (Ct.Ch.

1908), aff'd 77 N.J.Eq. 588, 78 A. 1134 (Ct.Err. & App.1910); Smith v. City of Rochester, 92 N.Y. 463 (1883); Strobel v. Kerr Salt Co., 164 N.Y. 303, 58 N.E. 142, 51 L.R.A. 687 (1900); Van Etten v. City of New York, 226 N.Y. 483, 124 N.E. 201 (1919); Ferguson v. Village of Hamburg, 272 N.Y. 234, 5 N.E.2d 801 (1936).

■■ Diversion, as applied to watercourses, is the taking of water from a stream without returning it for the use of lower riparian owners. Strobel v. Kerr Salt Co., 164 N.Y. 303, 58 N.E. 142, 51 L.R.A. 687 (1900).

" * * * each owner of land contiguous to a natural watercourse has a right, as owner of such land and as naturally connected with and incident to it, to the natural flow of the stream along his land and its descent, and all of the force to be derived therefrom, for any domestic or hydraulic purpose to which he may decide to apply it. He may, by means of a ditch or conduit, withdraw water from the stream and cause it to flow unnaturally through his land for agricultural, industrial or other purpose, provided he causes it, in its substantial volume, to return upon his land to the stream." United Paper Board Co. v. Iroquois Pulp and Paper Co., 226 N.Y. 38, 44–45, 123 N.E. 200, 202 (1919).

■ The absolute right of a lower riparian owner to the undiminished flow of water is qualified by a doctrine of reasonable use. As was stated in Prentice v. Geiger, 74 N.Y. 341, 345 (1878):

" * * * as all proprietors on the stream have an equal right to the use of the water and to share in the benefits from its use, the right of the several owners is not an absolute, but a qualified one, and the use of each must be such as is consistent with the substantial preservation of the equal rights of others. There are some uses which by common consent a riparian owner may have of the water, as it flows upon his premises, although such use may to some extent interfere with the use of the stream in its natural flow by the proprietors below."

The Court stated that diversion for watering cattle or for other domestic purposes would be permissible, although such uses might "diminish the volume of the stream to the detriment of lower proprietors". Id.

"As the enjoyment of each must be according to his opportunity and the upper owner has first chance, the lower owners must submit to such loss as is caused by reasonable use. Surrounding circumstances, such as the size and velocity of the stream, the usage of the country, the extent of the injury, convenience in doing business and the indispensable public necessity of cities and villages for drainage, are also taken into consideration, so that a use which, under certain circumstances, is held reasonable, under different circumstances would be held unreasonable." Strobel v. Kerr Salt Co., 164 N.Y. 303, 320–321, 58 N.E. 142, 147 (1900).

■ The question of reasonable use is generally a question of fact, but whether the undisputed facts and the necessary inferences therefrom, establish an unreasonable use is a question of law. Ibid.

This Court must therefore consider whether the defendant's present diversion of water and such diversion as is within the limits established by the New York Water Resources Commission, constitute, as a matter of law, unreasonable diversion.

The background facts submitted by the parties present a partial picture of the growth of the water industry along the Hackensack River since 1951 and the benefits accruing to the parties from the improvements made by Spring Valley. Thus it appears that the construction of the DeForest Dam and Reservoir was permitted by the Commission on the conditions that 12 MGD of the expected 20 MGD flow of the River be released and apportioned for use (i. e. diversion) in Rockland County, including a minimum

of 2 MGD for use by the defendant, and that a flow of 7.75 MGD be reserved for the use of the plaintiff. In fact, the safe yield of water through Rockland County and into the plaintiff's Oradell Reservoir in New Jersey increased by between 7.5 and 19.5 MGD following the construction of the DeForest facilities. (N. Y. Water Power and Control Commission, Water Supply Application No. 3431, decision December 9, 1958, ¶ 20, p. 8.) Defendant claims that the excessive flow into New Jersey has been occasioned by the failure of plaintiff's subsidiary, Spring Valley, to use the water reserved to it by the Commission. Such results appear to bear out the fears of the objectors to the DeForest project who claimed that their land was being inundated and their property condemned primarily for the benefit of residents of the State of New Jersey.

The plaintiff, however, is not satisfied with this additional yield from the River. It claims that it is entitled to the undiminished flow of the regulated stream, presumably even water used by its subsidiary Spring Valley.

The defendant's contention that it is making a reasonable use of the flow of the River and that plaintiff is not entitled to the entire increase created by the DeForest project would be strengthened if an allegation made in its brief (with reference to testimony at a Commission hearing not now before the Court) could be substantiated. The defendant asserts that George Buck, president of Spring Valley, testified at the Commission hearings in 1958 (R. p. 602, July 24, 1958), that the flow of the River just above Nyack's intake before 1956 was about 1 MGD. Since Nyack's withdrawal between 1952 and 1958 had averaged slightly more than 1.2 MGD, it would appear that almost no water remained in the River to flow below Nyack's intake and through plaintiff's riparian land. The defendant claims that, prior to 1956, the entire flow of the Hackensack River in New Jersey was created by tributaries and reservoirs originating in

New Jersey and not flowing past defendant's intake. If this were true, it would place plaintiff in the posture of claiming the proceeds of a flow in the River which was non-existent prior to the construction by a third party (Spring Valley) of artificial facilities in New York State.

Further support for this contention of the defendant may be found from the record. Thus, the Commission in 1952 found that the entire flow of the Hackensack River from the DeForest Dam would be 20 MGD of which 7.75 MGD was to be reserved to the plaintiff. Since the *increase* in plaintiff's flow following completion of the dam was said to be between 7.5 and 19.5 MGD it would appear that the flow from New York prior to construction of the dam was at best negligible. This fact, however, cannot be determined from the record without speculation.

If, as defendant indicates, the entire flow of the Hackensack River below the Nyack intake was artificially created in 1956, this fact would be relevant and material. See e. g. Exton v. Glen Gardner Water Co., 129 A. 255, 3 N.J.Misc. 613 (Ch.Ct.1925). In *Exton*, the complainants contended that the defendant had diverted water flowing from a spring on defendant's land to a stream running past complainants' mills. The Court found that, prior to the construction of a reservoir by the defendant, no water flowed from the defendant's land into the stream, and that therefore the complainants were not entitled to the use of a flow created by the defendant.

The plaintiff contends that *Exton* is not the law in New York, and that in Varick v. Smith, 5 Paige Ch. 137 (N.Y. Ct.Ch.1835), it was held that a downstream riparian owner is entitled to the flow of a river undiminished by upstream diversion, even where the river had been altered from its natural course by the creation of a dam. In that case, however, it did not appear that the artificial alteration of the river had increased the volume of water flowing therein, and the *Varick* case is therefore not controlling here.

While no New York case has held that artificially created increase in the flow of a stream is or is not, as a matter of law, the property of a downstream riparian owner, such alteration is a circumstance which must be considered in determining whether an upstream owner's diversion is reasonable.

Other factors to be considered are the uses to which the water is put by the respective parties and the amounts required by them, as well as the existence of alternative sources of water supply. Both the plaintiff and the defendant supply water to domestic and industrial users, the defendant as a municipality, the plaintiff as a privately owned utility. The defendant withdraws approximately 1.3 MGD, and seeks to withdraw up to 3.5 MGD. The plaintiff diverts between 7.5 and 19.5 MGD of water flowing past the defendant's intake, and additionally more than 55 MGD originating below the defendant's intake. The defendant asserts that it has no other available source of water. Development of the equities involved in depriving defendant of its use of the Hackensack River or of charging it for water which Nyack uses without payment of compensation involves resolution of disputed issues of fact. It is alleged that the defendant would be forced to raise its rates to customers, and presumably the plaintiff would be enabled to lower its rates should damages be forthcoming. Clearly, matters of this kind, if pertinent, cannot be resolved on these motions.

If plaintiff were located in New York, it is probable that it could be required to share its water resources with the defendant without payment of any fee therefor. See, City of Syracuse v. Gibbs, 283 N.Y. 275, 28 N.E.2d 835 (1940).

The observation of Mr. Justice Holmes in State of New Jersey v. State of New York, 283 U.S. 336, 342, 51 S.Ct. 478, 75 L.Ed. 1104 (1931), involving the rights of two sovereign States to the waters of the Delaware River, may be considered by analogy in resolving the equities here:

"A river is more than an amenity, it is a treasure. It offers a necessity of life that must be rationed among those who have power over it. New York has the physical power to cut off all the water within its jurisdiction. But clearly the exercise of such a power to the destruction of the interest of lower States could not be tolerated. And on the other hand equally little could New Jersey be permitted to require New York to give up its power altogether in order that the River might come down to it undiminished. Both States have real and substantial interests in the River that must be reconciled as best they may * * *."

From the foregoing it is apparent that the right of the plaintiff to the undiminished flow of water on the Hackensack River cannot be established as a matter of law. On the other hand, it is by no means clear that as a matter of fact the defendant's use of water of the Hackensack River is reasonable. Several issues exist as to which material facts do not appear in the record; nor can the ultimate issue of the defendant's reasonable use of water from the Hackensack River be determined on this motion.

In considering the factual issues, defendant asserts that the common law doctrine of diversion and reasonable use is inapplicable to the case at bar, as the rights in controversy relate to an interstate stream and the parties are located in different states.

In State of Connecticut v. Com. of Massachusetts, 282 U.S. 660, 670, 51 S. Ct. 286, 75 L.Ed. 602 (1931), the Supreme Court refused to apply the common law doctrine in force in both states in determining the rights of Massachusetts, the higher state on the Ware and Swift Rivers, to divert water from Connecticut. The Court said that "[t]he determination of the relative rights of contending States in respect of the use

of streams flowing through them does not depend upon the same considerations and is not governed by the same rules of law that are applied in such states for the solution of similar questions of private right. State of Kansas v. State of Colorado, 185 U.S. 125, 146, 22 S.Ct. 552, 46 L.Ed. 838". See also, State of New Jersey v. State of New York, 283 U.S. 336, 51 S.Ct. 478, 75 L.Ed. 1104 (1931). In each of these cases the Supreme Court applied the so-called doctrine of "equitable apportionment".*

■ The present lawsuit, however, does not involve either the State of New York or the State of New Jersey. Neither state has demonstrated an interest in this controversy, and the power of the upper riparian state, New York, to cut off the water supply of the lower riparian owner and New Jersey has not been exercised. The present record is not sufficient to determine whether this suit involves the same considerations as a suit between two riparian owners in the same state, or whether defendant is entitled to greater or lesser rights by virtue of its location near the New York-New Jersey border, across that border from the plaintiff.

The plaintiff's motion for summary judgment on its complaint will therefore be denied.

The issues on the plaintiff's application to dismiss the affirmative defenses set forth in the answer are next to be considered along with the defendant's motion for summary judgment based upon the defenses.

FAILURE TO FILE TIMELY CLAIM (THIRD Affirmative Defense):

■ Under applicable New York statutory law no action may be commenced against a village for injury to property rights unless (1) a notice is served and filed within ninety days after the claim arises; (2) at least thirty days are allowed to elapse; and (3) the action is commenced within one year and ninety days after the happening of the event on which the claim is based (General Municipal Law, McKinney's Consol. Laws, c. 24, §§ 50–e[1], 50–i[1]; Village Law, McKinney's Consol.Laws, c. 64, § 341).

■ Notice of claim in the instant action was filed with the defendant on May 22, 1967, and suit was commenced on July 5, 1967. While the complaint seeks damages for a period commencing in May, 1966, the provision of Section 50–e, supra, that "In any case founded upon tort where a notice of claim is required by law as a condition precedent to the commencement of an action * * * the notice * * * shall be given within ninety days after the claim arises" operates to bar any claim for damages incurred more than ninety days prior to May 22, 1967. See Collins v. State of New York, 103 Misc. 217, 175 N.Y.S. 555 (Ct.Cl.1918); Garnerville Holding Company v. State of New York, 5 Misc.2d 611, 160 N.Y.S.2d 419 (Ct.Cl. 1957).

With respect to the remainder of plaintiff's claim, the plaintiff asserts that the act complained of is a continuing trespass, as to which "each new day established the cause anew." Bloss v. Village of Canastota, 35 Misc.2d 829, 831, 232 N.Y.S.2d 166 (Sup.Ct.Mad.Co.1962). See also Hartzell v. Village of Hamburg, 155 Misc. 345, 279 N.Y.S. 650 (Sup.Ct., Erie Co.1935), aff'd, sub nom. Caudwell v. Village of Hamburg, 248 App.Div. 667, 289 N.Y.S. 910, modified on other grounds, 273 N.Y. 476, 6 N.E.2d 411 (1936), in which plaintiff downstream owner asserted a claim against a village for damages and an injunction forbidding the defendant to continue to divert water for the purposes of the village's water supply. The village interposed the notice of claim defense herein asserted on the grounds that diversion had begun several years earlier. The defense was dismissed because of the continuing nature of the injury. 155 Misc. at 349, 279 N.Y.S. 650.

The basis for the rule of law that continuing trespasses or uncompensated di-

---

* A balancing of interests according to the equities.

versions are not barred by the passage of time is the judicial determination that the injured party should not be required to bring more than one action or to institute proceedings before he is aware of the potential extent of his injury. United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947).

Defendant, however, cites Schenker v. Village of Liberty, 261 App.Div. 54, 24 N.Y.S.2d 511 (3d Dept. 1941), aff'd 289 N.Y. 788, 47 N.E.2d 47 (1943), for the proposition that the notice of claim rules apply as well to continuing trespasses as to other claims. This proposition is indisputable. In Schenker, it was applied to bar a claim against a village arising from an alleged ineffectual sewage system. The suit was dismissed because the complaint failed entirely to allege compliance with § 341, supra. In the instant case the complaint alleges that a notice of claim was filed with the defendant, and unless the claim is barred by laches, the notice of claim must be given effect with respect to such causes of action which were deemed to have "arisen anew" commencing ninety days prior to the filing of the notice of claim. Accordingly, the defense of failure to file timely notice of claim is dismissed, except insofar as it operates to bar a claim for damages incurred more than ninety days prior to May 22, 1967. Partial summary judgment is granted to the defendant with respect to any such claim for damages.

LACHES (FOURTH Affirmative Defense):

The defendant contends that the plaintiff has been aware of the facts allegedly giving rise to the instant law suit since 1952, when the New York Water Resources Commission reserved at least 2 MGD for defendant's use. Defendant contends that no objection to this reservation was made by the plaintiff until 1958, when the defendant applied for and received permission to build a new filtration plant of increased capacity. In reliance upon the reservation in 1952 and the determination in 1958, the defendant asserts that it commenced plans for this new filtration system.

On this motion, however, defendant has as a matter of law failed to allege facts sufficient to give rise to a defense of estoppel by laches. It appears from the affidavits submitted that, while permitted to withdraw up to 2 MGD since 1952, the defendant's actual diversion from the Hackensack River averaged 1.102 MGD in 1952, and had risen only to 1.3 MGD in 1957. Since 1958 the average yearly rate has been 1.37 MGD. Imminent, however, at the time this suit was commenced was a plan to divert the waters of the Hackensack River at a rate double that previously and presently diverted, as well as a proposal to construct a water treatment plant.

These plans have not as yet been put into operation by the defendant, and it appears that it was to forestall such result that the instant law suit was commenced. No facts have been alleged by the defendant which spell out the reliance to its detriment necessary to sustain a defense of laches. Its new programs have not gotten beyond the planning stages. Defendant, itself, asserts that it has no alternative means of water supply. If plaintiff is entitled to compensation as a result of the defendant's diversion from the Hackensack, such compensation, on the basis of the facts alleged, would seem unavoidable and diminished rather than increased by reason of the plaintiff's delay in instituting the instant law suit.

A situation analogous to the case at bar was presented in Lyon v. Water Commissioners of City of Binghamton, 228 App.Div. 585, 240 N.Y.S. 647 (3d Dept.1930). In that case plaintiff had been aware of the defendant's diversion of water for sixteen years prior to the commencement of the law suit; diversion had been at a consistently high level for six years immediately prior thereto. The Court, nevertheless, dismissed the defendant's claim of laches and granted damages to the plaintiff.

In any event, the defense of laches is unavailable in an action at law with respect to a claim for damages. Appleton v. National Park Bank of New York, 211 App.Div. 708, 714, 208 N.Y.S. 228 (1st Dept.), aff'd 241 N.Y. 561, 150 N.E. 555 (1925).

The affirmative defense of laches is dismissed.

## COLLATERAL ESTOPPEL AND RES JUDICATA (FIFTH and SIXTH Affirmative Defenses):

The defendant contends that the decisions of the New York Water Resources Commission in 1952 and 1958 and the Appellate Division's affirmance of the latter decision constitute a bar to the instant claim.

No support for this contention is found in any portion of the decisions relied on by the defendant. Indeed, in the 1958 decision, the Commission stated that:

"It is not within the purview of this Commission to determine the amount of compensable damages which might be caused by the diversion of water from the Hackensack River. Payment for such legal damages presumably could be made by the village from sources of funds available to it * * *. The compensable amounts can be determined, if necessary, by the courts." (Finding No. 44).

Nor did the Commission pass upon the claims of certain objectors to its determination that granting water rights to the defendant would constitute an unconstitutional taking of property without compensation.

The Appellate Division in Spring Valley Water Works and Supply Company v. Wilm, 14 A.D.2d 658, 218 N.Y.S.2d 800 (3d Dept.1961), upheld the Commission's 1958 decision stating that the Commission's factual determination that the defendant had resources with which to compensate riparian owners for diver-sion of water was a sufficient finding of fact to permit the diversion by the defendant from the Hackensack River.

It is clear that both the Commission and the Appellate Division rather than seeking to preclude compensation by the defendant anticipated future determination of any such compensation.

Approval of diversion of the water by the Water Resources Commission is not a bar to a subsequent claim by riparian owners to be compensated for such diversion. Ferguson v. Village of Hamburg, 272 N.Y. 234, 241, 5 N.E. 2d 801 (1936).

The defenses of collateral estoppel and res judicata are dismissed.

## SOVEREIGN POWER

The defendant asserts that the Water Resources Commission's reservation to Nyack in 1958 of 3 MGD constituted an exercise by the State of New York of its sovereign power over the use of navigable waters within its borders. The exercise of this sovereign power is said to preclude an award of damages to the plaintiff.

The plaintiff, on the other hand, maintains that, if New York State permitted the diversion of water which would ordinarily flow through lower riparian lands without making compensation therefor, this would constitute a violation of both the state and the federal Constitutions.

It is not at all clear that, *if* the Water Resources Commission purported to grant to the Village of Nyack the right to divert 3 MGD without making compensation therefor to the lower riparian owner (assuming that such diversion if done by a private person would be wrongful), such a grant would constitute an unconstitutional taking of the plaintiff's property without compensation. Cf. Gardner v. Trustees of Village of Newburgh, 2 Johns Ch. 161 (N.Y.Ct. Ch.1816); Van Etten v. City of New York, 226 N.Y. 483, 124 N.E. 201 (1919).[1]

---

1. In *Van Etten*, supra, the Court held that New York City could not impound the waters of Esopus Creek, which flowed past the city and onto the riparian

In the instant case, however, there is no necessity to determine whether or not the State in the exercise of its sovereign power may take the plaintiff's riparian rights without requiring compensation therefor. As was stated earlier, the State through its Commission purported to do no such thing.

Repeating again the finding of the Commission in Application No. 3134, December 9, 1958, (No. 44):

"It is not within the purview of this Commission to determine the amount of compensable damages which might be caused by the diversion of water from the Hackensack River * * * the compensable amounts can be determined, if necessary, by the courts."

This disclaimer of jurisdiction was affirmed by the Third Department in Spring Valley Water Works and Supply Company v. Wilm, 14 A.D.2d 658, 218 N.Y.S.2d 800 (1961).

The State, therefore, has not purported to acquire the lower riparian rights of the plaintiff by the exercise of its sovereign power, and no constitutional issue is presented.

RELIEF (SECOND Affirmative Defense):

The defendant asserts that the plaintiff is not entitled to a declaratory judgment or an injunction absent a showing of prospective damages, and that therefore the complaint should be dismissed for failure to allege facts upon which relief can be granted.

Plaintiff, in seeking a declaratory judgment, relies in part upon Section 429–j(1) of the New York State Conservation Law, which provides, in part, that an alteration in "the natural

---

land of the plaintiff, without taking riparian rights by eminent domain and making compensation therefor. It should be noted, however, that Esopus Creek was a non-navigable fresh water stream and the taking was not by the hand of the State or an agency thereof but by a municipality.

In City of Syracuse v. Gibbs, 283 N.Y. 275, 28 N.E.2d 835 (1940), reversing 258 App.Div. 405, 17 N.Y.S.2d 293 (3d Dept. 1940), on the other hand, the Court upheld a decision by the Water Power and Control Commission which granted to the Village of Jordan the right to divert water without payment by tapping a conduit of the City of Syracuse, a riparian owner which took water from Skaneateles Lake. Syracuse asserted, in opposition to the Commission's decision, that it had been granted exclusive rights to withdraw water from the Lake for use in its water supply system. The Court found that by the express terms of legislation dealing with the Syracuse water system no exclusive grant had been made and that no property interest of the State in the waters of the Lake had been granted. The Court further held that such an exclusive grant would be beyond the powers of the Legislature. The Court said:

"It was the duty of the State to control and conserve its water resources for the benefit of all the inhabitants of the State. The public right to the benefit of such resources is an incident of sovereignty. The Legislature, when acting within constitutional limitations and in the interest of the public, may, at will, grant, withhold, or condition the privilege to a municipality of taking water from a public source * *." 283 N.Y. at 283, 28 N.E.2d at 838.

See also People v. System Properties, Inc., 2 N.Y.2d 330, 160 N.Y.S.2d 859, 141 N.E.2d 429 (1957), in which the Court of Appeals held that a dam operator could never acquire any prescriptive rights against exercise of the State's sovereign power over Lake George. The Court stated that the State has sovereign power "as great as the uses and possibilities of the lake for navigation, as a waterpower reservoir and not excluding recreational uses * * *." 2 N.Y.2d 344–345, 160 N.Y.S.2d 868, 141 N.E.2d 435. See also Niagara Falls Power Co. v. Duryea, 185 Misc. 696, 57 N.Y.S.2d 777 (Sp. Tm., Albany Co. 1945), in which it was held that a legislative grant of a water power use to downstream riparian owners was subject to revocation by the state in the exercise of its sovereign power. The Court reviewed several cases dealing with the exercise of the sovereign power, and concluded that sovereign power exists to control water in a public stream, even where riparian rights therein are owned by others, "where a public use in the interests of commerce as well as navigation may be discernible. Matter of City of New York [Jamaica Bay], 256 N.Y. 382, 385, 176 N.E. 539, 541." 185 Misc. at 703, 57 N.Y.S.2d at 783.

flow, quantity, quality or condition of a natural watercourse", effected by the use of water either on or off riparian land, including withdrawal, impoundment, or obstruction of such water, "is reasonable and lawful as against any person * * * having an interest in such watercourse * * * unless such alteration is causing harm to him or it, or would cause him or it immediate harm if and when begun".

Under Section 429–j(2), "harm" is defined as either

"(a) interference with a present use of the water by the complaining party or an interference with the complaining party's present enjoyment of riparian land * * * "

either past or prospective, or

"(b) a decrease in the market value of the complaining party's interest in riparian land * * *."

The defendant's contention that no harm has been or will be done to plaintiff's riparian interests may be disposed of summarily. If the plaintiff is entitled to the undiminished flow of the Hackensack River, then such damages would exist as are contemplated by the statute. If the plaintiff is not entitled to such undiminished flow, then its suit will be dismissed after trial.

## INSUFFICIENCY OF COMPLAINT (SECOND Affirmative Defense):

In addition to the general defenses asserted with respect to the plaintiff's claim, the defendant contends that it has acquired certain prescriptive rights to the use of water in the Hackensack River.

The statute prior to September 1, 1963 governing acquisition of a prescriptive right to real property in New York where the claim is based on adverse user for a period of time is former Civil Practice Act § 34 which prescribed a period of fifteen years. The current statute, which became effective September 1, 1963 (Civil Practice Law and Rules § 212[a]) shortens the period to ten years.

The defendant claims to have diverted an average of 1.102 MGD from the Hackensack River, in every year since 1952 and seeks partial summary judgment therefor.

Adverse use of water diverted from a river depriving a lower riparian owner of the use thereof must be open, continuous, under claim of right and hostile for the requisite period of time. In Knauth v. Erie Railroad Co., 219 App.Div. 83, 85–86, 219 N.Y.S. 206, 209 (2d Dept.1926), the Court said:

"The defendant does not assert a right to draw water from said brook as a riparian owner. What it does claim is that having abstracted waters from said brook to facilitate the operation of its trains for a period of over twenty years, it has acquired a prescriptive right to the waters of such brook, which, of course, means forever, irrespective of the injury to plaintiff's property and mill. The assertion of such a right which carries with it the taking away from the owner of the land below one of its natural advantages, capable of being applied to profitable purposes, and depriving him of it altogether by anticipating him in its application to a useful purpose, can only be permitted upon indubitable proof that the prescriptive right has been obviously exercised by the one claiming it and to the manifest injury of the one against whom it is claimed."

Until determination of the issue of reasonableness of the defendant's use of the River, it would be inappropriate to consider the applicability of the doctrine of prescriptive right; that would apply only to the period of unreasonable use, if any. Defendant's motion for partial summary judgment with respect to the use of 1.02 MGD is denied, as is plaintiff's motion to dismiss that defense.

## OTHER DEFENSES

The defendant has consented to dismissal of its FIRST Affirmative De-

fense (jurisdictional amount) and its SEVENTH Affirmative Defense (justiciability).

\* \* \*

There remains for consideration plaintiff's motion to dismiss the defendant's counterclaims.

The counterclaims assert that plaintiff and its wholly-owned subsidiary Spring Valley Water Company are actual and potential competitors of the defendant for water supply business in Rockland County. Defendant claims that these competitors are now and have been engaged in a continuing concert of action to injure defendant's business, and to obtain complete control of the water supply business in the area. The defendant asserts that to these ends plaintiff and Spring Valley have acquired most of the land along the River bank in New York and upper New Jersey and a number of independent water suppliers and that defendant remains the only independent supplier of any consequence in the upper River area.

The defendant further says that as a consequence of this concerted effort to obtain its business by improper means it has been and will be injured.

The plaintiff responds to these claims with the contentions, among others, that extensive discovery and inspection have failed completely to adduce evidence to support the counterclaims.

■ The short answer here is that issue finding, not issue resolution, is the Court's task on a motion for summary judgment. See, generally, 6 Moore's Federal Practice (Second Edition) ¶ 56.04[1]. If a genuine issue of material fact has been demonstrated, the Court's inquiry stops and the motion must be denied.

Pretrial discovery by the defendant has not yet been completed. Issues of motive and intent of plaintiff's acts are clearly present. It will require a trial of the facts to determine whether those acts are really an attempt to interfere with the business relations of Nyack, a competitor; and whether they were done to control the water supply business and eliminate Nyack therefrom.

■ The counterclaims are not ripe for resolution on the motion of the plaintiff. It may be that, as a matter of law, certain acts ascribed to the plaintiff, e.g. attempting to influence or to finance condemnation proceedings against the defendant, cannot give rise to substantive liability.[2] Partial legal defenses to the counterclaims need not, however, be determined on this motion and no determination thereof is made at this time.

\* \* \*

Accordingly, plaintiff's motions for summary judgment in its favor on the complaint and counterclaims and with respect to the defenses are denied, except that the "FIRST", "THIRD", "FOURTH", "FIFTH", "SIXTH" and "SEVENTH" affirmative defenses are dismissed. Defendant's motion for summary judgment in its favor is denied, except that plaintiff's claim for damages accruing more than ninety days prior to May 22, 1967, is dismissed.

Settle a single order accordingly after conference on the terms thereof between counsel.

2. See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Transactions not forming the basis of liability may, however, constitute evidence of the "purpose and character of the particular transactions under scrutiny. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 46–47, 31 S.Ct. 502, 510, 55 L.Ed. 619; United States v. Reading Co., 253 U.S. 26, 43–44, 40 S.Ct. 425, 427, 428, 64 L.Ed. 760." Federal Trade Commission v. Cement Institute, 333 U.S. 683 at 705, 68 S.Ct. 793 at 805, 92 L.Ed. 1010 (1948).